# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANHEUSER-BUSCH, INC., ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 10-cv-1601 |
| | ) | |
| STEPHEN B. SCHNORF, ET AL., | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs have filed a lawsuit challenging the Illinois Liquor Control Commission's ("Commission" or "ILCC") construction of the Illinois Liquor Control Act of 1934 ("Act") on several federal constitutional grounds. The lawsuit was spurred by Plaintiffs' contention that the Commission's action unlawfully blocked a "significant and important business transaction" – namely, the acquisition by Anheuser Busch, Inc. (an out-of-state brewer of beer) of City Beverages (an in-state distributor of beer).

Currently before the Court is Plaintiffs' motion for partial summary judgment [28], seeking a declaration that the Commission's construction of the Act violates the Commerce Clause. The Court granted Plaintiffs' request for expedited briefing on that claim (a request that the State Defendants, represented by the Illinois Attorney General, did not oppose) and heard oral argument on June 16, 2010. The Court also has granted the motions of several interested parties to participate as *amici curiae*: the Wine and Spirits Distributors Association ("WSDI"),

the Association of Beer Distributors of Illinois ("ABDI"), and the Illinois Craft Brewers Guild, Ltd. ("Guild").[1]

Having carefully considered the arguments of the parties and *amici*, both orally and in writing, the Court grants Plaintiffs' motion for partial summary judgment [28] on the Commerce Clause claim.  In regard to the remedy that follows from the Court's Commerce Clause ruling, the parties and *amici* agree that the Court, in the exercise of its discretion, must choose one of two alternatives:  either "extension" or "nullification" of the unconstitutional in-state benefit.  In the particular circumstances of this case, the Court concludes that "nullification" – that is, withdrawing self-distribution privileges from in-state brewers rather than extending those privileges to out-of-state brewers – does the "minimum damage" to the legislative and regulatory scheme under the Illinois Liquor Control Act, and thus is the appropriate remedy.  Finally, because the Court's choice of remedy rests on judgments as to the intent of the Illinois General Assembly and implicates matters of public policy as to which the General Assembly is the ultimate arbiter, the Court temporarily stays enforcement of its ruling to provide the General Assembly an opportunity to act definitively on this matter if it chooses to do so.

I.      **Background**

A.      **The Liquor Control Act**

Like many states, Illinois regulates the production, importation, distribution, and sale of alcoholic beverages through a three-tier licensing system.  The function performed at each of the tiers (*i.e.,* production, distribution/wholesale,[2] and retail) requires separate licensing and compliance with regulations specific to that tier.  Pursuant to the Liquor Control Act, to

---

[1] One of those parties, WSDI, sought to participate as an intervenor.  The Court denied the motion to intervene in a written decision [89], but accepted the WSDI's memorandum [76-2] as an *amicus* brief.

[2] The terms "distribution" and "wholesale" are used interchangeably throughout this opinion.

distribute beer in Illinois, it is necessary to hold a Distributor's License, and to import beer from out-of-state for distribution in Illinois, it is necessary to hold an Importing Distributor's License. In-state beer producers may hold a Brewer's License, which entitles them to hold Distributor's and Importing Distributor's Licenses. See 235 ILCS 5/5-1(a) ("A Brewer may make sales and deliveries of beer * * * to retailers provided the brewer obtains an importing distributor's license or distributor's license in accordance with the provisions of this Act."). According to the Commission, an out-of-state beer producer is ineligible to hold Distributor's and Importing Distributor's Licenses. However, out-of-state producers are not precluded from selling their product within the State. Indeed, in 2008, Plaintiff Anheuser-Busch, Inc. distributed more than 38 million gallons of beer within Illinois through various distributors. But, according to the Commission, an out-of-state producer must go through an in-state distributor. In other words, in-state brewers are permitted to perform the distribution function in Illinois, while out-of-state brewers are precluded from doing the same. Taking this one step further, on account of its non-resident status, an out-of-state brewer may not possess an ownership interest in a licensed Illinois distributor.

Prior to 1982, the Illinois Attorney General had opined that all brewers could self-distribute under the Liquor Control Act. In 1982, the General Assembly amended the statute to provide that out-of-state brewers must hold Non-Resident Dealer Licenses.[3] Because the Act did not specifically authorize non-resident dealers to distribute, the Commission has interpreted the Act to prohibit non-resident dealers from holding a Distributor's or Importing Distributor's License.[4]

---

[3] According to Plaintiffs, the Commission did not begin enforcing this provision in earnest until 2000.

[4] As explained below, the history of the Commission's licensing of companies affiliated with Plaintiff Anheuser-Busch, Inc. is in considerable tension with the Commission's current construction of the

## B. The Current Dispute

Plaintiff Anheuser-Busch, Inc. ("AB Inc.") is a wholly owned subsidiary of Anheuser-Busch Companies, Inc. AB Inc. does not brew or produce beer within Illinois and has not done so at any time relevant to this matter. At all times relevant to this matter, AB Inc. has exported beer produced elsewhere in the United States into Illinois for distribution within the state.

Each year during the period from 1982 through 2005, the Illinois Liquor Control Commission[5] issued to AB Inc., in its own name, one or more Illinois Distributor's and Importing Distributor's Licenses. During much of the period from 1982 through 2005, one or more affiliates of AB Inc. also held one or more Distributor's and Importing Distributor's Licenses. From 2005 through the present, AB Inc. affiliate Wholesaler Equity Development Corporation ("WEDCO") has maintained an ownership interest in an entity that held one or more Distributor's and Importing Distributor's Licenses. Plaintiff WEDCO is a wholly-owned subsidiary of Anheuser-Busch Companies, Inc. From the formation of Plaintiff City Beverage – Illinois LLC in 2005 through the present, WEDCO has maintained a thirty percent ownership interest in City Beverage. Plaintiffs SD of Illinois, Inc. ("SDI") and Double Eagle Distributing

statutory scheme. At oral argument, counsel for Defendants candidly characterized the Commission's prior treatment of the licensing of those companies as a "mistake" that involved "some sort of *de facto* grandfathering in" of the situation that existed prior to the 1982 amendment. June 16 Trans. at 9. For purposes of the motion now before Court, the parties have agreed that, notwithstanding any prior "mistakes," the Commission's current interpretation of the Act is the one that matters for purposes of Plaintiffs' declaratory judgment claim. For reasons that have to do with the limitations on a federal court's authority to instruct state actors (like Defendants here) how to comply with state law (see *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)), the parties' position is correct, and the efforts by some of the *amici* to resist that proposition by offering a competing construction are directed to the wrong tribunal.

[5] Defendants in this case are affiliated with the Commission. Stephen Schnorf is the Acting Chair and a Commissioner of the ILCC and Defendants John Aguilar, Daniel Downes, Sam Esteban, Michael McMahon, Martin Mulcahey, and Donald O'Connell are Commissioners of the ILCC. Defendant Richard Haymaker is Chief Legal Counsel of the ILCC. Defendants are named in this suit in their official capacities. See *Ex parte Young*, 209 U.S. 123, 157-60 (1908); *Entertainment Software Ass'n v. Blagojevich*, 469 F.3d 641, 644-45 (7th Cir. 2006).

Company ("Double Eagle") (SDI and Double Eagle are referred to collectively as the "Soave Entities") each have owned a thirty-five percent interest in City Beverage. City Beverage is the parent company of City Bloomington, City Chicago, and City Markham. City Bloomington, City Chicago, and City Markham have held from 2005 through the present both Illinois Distributor's and Importing Distributor's Licenses in various names.

In December 2009, WEDCO reached an agreement with the Soave Entities to purchase the Soave Entities' combined seventy percent interest in CITY Beverage. The transaction was scheduled to close on February 12, 2010. On January 6, 2010, AB Inc. and WEDCO notified the Commission that WEDCO planned to purchase a distributor in Illinois. From January 6 through January 17, the Commission requested information from Plaintiffs regarding the ownership of WEDCO. On January 27, 2010, AB Inc. and WEDCO notified the Commission that WEDCO (a wholly owned subsidiary of AB Inc.) planned to acquire the additional seventy percent interest in CITY Beverage.

The parties prepared to close on the transaction on February 12. On February 11, 2010, Ivan Fernandez, legal counsel for the Commission, e-mailed to Nancy Kamp of AB Inc. a letter from Defendant Haymaker stating that it would be unlawful for WEDCO to complete the acquisition of City Beverage. After receipt of Defendant Haymaker's letter, AB Inc. and WEDCO postponed the purchase of City Beverage that otherwise appeared poised to close on February 12, because Mr. Haymaker's letter stated that it would violate Illinois law to do so. To date, the parties have not completed the transaction.

On March 2, 2010, the Commission held a "Special Session" on the question of whether an Illinois non-resident dealer may hold an Illinois Distributor License. On March 10, 2010, the Commission issued a ruling in which it stated that the Illinois Liquor Control Act "prohibits an

Illinois-licensed Non-Resident Dealer from possessing an ownership interest in a licensed Illinois distributor."  In support of its decision, the Commission explained that the three-tier system promotes temperance by protecting against "vertical monopolies and economies of scale that would lead to the introduction of cheap alcohol liquor into the marketplace."  In support of its ruling, the Commission also cited the State's interest in tax collection, an orderly market, and public safety.  The ruling permitted WEDCO to retain its current minority interest in CITY Beverage due to the "history and facts surrounding this case."  The declaratory ruling added that the Commission would "renew said CITY Beverage distributors licenses upon their expiration and as currently owned absent any other license disqualifying factors.  This factual determination is limited solely to the history and facts surrounding this case and will have no bearing on future legal declarations or rulings from the [Commission]."  On April 1, 2010, the Commission issued its annual renewal of CITY Bloomington's Distributor's and Importing Distributor's Licenses.

Currently, only two in-state brewers – Argus and Big Muddy – hold distribution rights, and they are limited to distributing their own products.[6]  Neither has held its distributors' license for long; Big Muddy was licensed in June 2009, while Argus obtained its license in February 2010.  A third in-state brewer, Goose Island Beer Co., holds a distributor's license but currently does not self distribute.  AB Inc. has an ownership interest in Goose Island.

## II.     Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether there is a genuine issue of fact,

---

[6]  For purposes of this motion, the parties do not dispute that Argus and Big Muddy are relatively small producers.

the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

AB Inc. currently holds a Non-Resident Dealer's License and proposes to become a distributor by acquiring a 100% ownership interest in Illinois distributor City Beverage. But the Act's definition of "distributor" specifically excludes non-resident dealers: "Distributor means any person, other than a manufacturer or non-resident dealer licensed under this Act, who is engaged in this State in purchasing, storing, possessing, or warehousing any alcoholic liquors for resale or reselling at wholesale, whether within or without this State." 235 ILCS 5/1-3.15. Common ownership or affiliation between out-of-state brewers and entities that hold distribution

licenses also is illegal according to Defendants, and thus Defendants have stated that WEDCO's acquisition of CITY Beverage would be unlawful under the Commission's interpretation of the Act. However, the Commission interprets the Act to permit in-state brewers to act as distributors: "[A] brewer may make sales and deliveries of beer * * * to retailers provided that the brewer obtains an importing distributor's license or distributor's license in accordance with the provisions of this Act." 235 ILCS 5/5-1(a). Plaintiffs seek a declaratory judgment invalidating the prohibition against out-of-state brewers holding the licenses necessary to distribute beer in Illinois on the ground that the prohibition discriminates in favor of in-state (and against out-of-state) entities in violation of the Commerce Clause.

## A.    Threshold Issues

Before turning to the merits of Plaintiffs' constitutional claim, the Court first must address a few threshold issues that have been raised primarily by the *amici*.

*Amicus* WSDI contends that this Court lacks subject matter jurisdiction over Plaintiffs' Commerce Clause claim, which WSDI insists does not belong in federal court at this time "under the rubric of either standing or ripeness." WSDI Br. at 9. WSDI's jurisdictional argument rests on constructions of (i) the Illinois Liquor Control Act and (ii) the Commission's authority that are not shared by the Commission itself. WSDI argues that, properly understood, the Act does not discriminate between in-state and out-of-state economic interests, and thus Plaintiffs have not suffered any injury that is traceable to a Commerce Clause violation. See WSDI Br. at 5 ("WSDI's construction of the Act is proper in light of the Act's plain language and removes any claim that the Act is unconstitutional on its face"); *id.* (urging this Court to adopt WSDI's "plain language" construction to avoid reaching the constitutional question asserted by Plaintiffs). WSDI also submits that the Commission lacked authority to issue the declaratory ruling that

gave rise, at least in part, to this lawsuit. And following from that assertion, WSDI reasons that the declaratory ruling "is a legal nullity" that "does not a case or controversy make." *Id*. at 7.

Like WSDI, *amicus* ABDI also takes issue with the Commission's interpretation of the Liquor Control Act and urges the Court, under the doctrine of constitutional avoidance, to adopt a contrary statutory construction that "ABDI submits removes any constitutional issue, preserves Illinois' orderly, accountable, and stable regulatory system, and gives effect to all provisions of the Act." ABDI Br. at 7-8. *Amicus* Guild disagrees with the interpretation of the Act set forth by what it calls the "distributor *amici*" and devotes most of its brief to demonstrating why, in its view, WSDI and ABDI are misreading the statutory scheme. See Guild Br. at 2-4.

WSDI's first contention – that Plaintiffs cannot show an injury that is traceable to a Commerce Clause violation – challenges Plaintiffs' standing to maintain a lawsuit at all, for if WSDI were correct, there may not be a case or controversy sufficient to invoke this Court's jurisdiction under Article III. As the Seventh Circuit recently has reiterated, "[s]tanding exists when the plaintiff suffers an actual or impending injury, no matter how small; when that injury is caused by the defendant's acts; and when a judicial decision in the plaintiff's favor would redress that injury." *Brandt v. Village of Winnetka*, ___ F.3d ___, ___, 2010 WL 2813648, at *2 (7th Cir. July 20, 2010). The court of appeals further stressed that "[i]njury need not be certain." *Id*. In addition, and particularly apt in the circumstances of this case, the court observed that although a "pre-enforcement suit entails some element of chance" because some intervening event may occur to steer parties away from what appears to be a likely collision course, "pre-enforcement challenges nonetheless are within Article III." *Id*.; see also *MedImmune Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to

challenge the basis for the threat – for example, the constitutionality of a law threatened to be enforced") (emphasis in original).

Here, the record indicates that shortly before Plaintiffs planned to close on the City Beverage transaction, Defendant Haymaker, on behalf of the Commission, advised Plaintiffs that it would be unlawful to consummate the transaction under the Commission's current interpretation of the Liquor Control Act. Based on that guidance from the Commission, Plaintiffs were concerned that proceeding may subject them to administrative, civil, and criminal penalties, and so they stepped back from completing the deal. As Plaintiffs correctly observe, their legal dispute with Defendants concerning whether the Act bars Plaintiffs from completing the once-imminent deal to acquire City Beverage is sufficiently "definite and concrete" and "real and substantial" to confer standing, whether or not the Declaratory Ruling is void, as WSDI contends. Had Plaintiffs proceeded with what Defendants considered to be unlawful action, Plaintiffs potentially faced penalties, sanctions, and a significantly diminished asset if Defendants followed through on their (credible) threat to enforce their interpretation of the Act. That is an ample showing of injury – again, the injury "need not be certain." *Brandt*, 2010 WL 2813648, at *2. And because that injury is traceable to the Defendants' conduct and redressable by a decision in Plaintiffs' favor in this litigation, Plaintiffs have standing to sue. See *id*.

The contention by certain *amici* that the Court should reject the Commission's construction of the Act and, under the constitutional avoidance doctrine, adopt *amici*'s alternative construction overlooks certain fundamental limitations on the authority of federal courts to impose their views of state law on state officials. At least since *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 103-23 (1984), it has been "well established that the Eleventh Amendment prohibits a federal court from ordering state officials to conform their

conduct to state law." *Komyatti v. Bayh*, 96 F.3d 955, 959 (7th Cir. 1996); see also *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993) (noting that under *Pennhurst*, "we may not exercise pendent jurisdiction to adjudicate claims that state officials are violating state law because such claims are barred in federal courts by the Eleventh Amendment"). In *Burgess v. Ryan*, 996 F.2d 180, 184 (7th Cir. 1993), the Seventh Circuit addressed both comprehensively and succinctly the reasons why this Court may not entertain the alternative statutory construction argument advanced by the *amici*:

> Behind many of Burgess's arguments lies a conclusion that employees of Illinois misunderstand Illinois law * * * * Yet it is not appropriate for a federal court, hearing a case under § 1983, to upbraid state officials for a supposed error of state law. Burgess was free to take his contentions to state court * * * * **A federal judge, by contrast, must assume that the state officials' interpretation is right – not necessarily because it** *is* **correct * * * but because errors in the interpretation of state law do not supply a basis for federal relief.** Constitutional adjudication tests the *power* of a state to act in a particular way; whether the state indeed wishes to act in that way is a question of its domestic law. **The Constitution does not require states to administer their laws correctly.**

(Italics in original, bold added for additional emphasis.) Thus, as the parties acknowledged at oral argument (see June 16 Trans. at 11-12), under *Pennhurst* and its progeny, the only construction of the Act that matters for purposes of the Commerce Clause claim on which Plaintiffs have sought partial summary judgment is the Commission's.

The Court hastens to add that *amici* are not alone in viewing this state of affairs as "an unhappy result." *Citizens for John W. Moore Party v. Board of Election Commissioners of the City of Chicago*, 781 F.2d 581, 585 (7th Cir. 1986) (Easterbrook, J., dissenting); see also David P. Currie, *Sovereign Immunity and Suits Against Government Officers*, 1984 SUP. CT. REV. 149, 164-67; David L. Shapiro, *Wrong Turns: The Eleventh Amendment and the* Pennhurst *Case*, 98 HARV. L. REV. 61 (1984). For, as Judge Easterbrook explained, "[c]ourts ordinarily struggle to

find ways to avoid resolving constitutional questions; the interpretation of the Eleventh Amendment adopted in *Pennhurst* may force a federal court to reach the constitutional issues even though plausible state-law grounds are available for decision." *Id*.; see also *Rogers v. Okin*, 738 F.2d 1, 4 (1st Cir. 1984) (noting the irony that "two years after the Supreme Court returned this case to us in furtherance [of] the Court's 'settled policy' of avoiding unnecessary constitutional questions, *Pennhurst* requires us to face those questions"). Indeed, Plaintiffs themselves plainly are less than comfortable proceeding in this Court on the basis of what they contend is a "highly questionable interpretation of the Act" (Pl. Br. at 19) and at times appear to want to resist that interpretation (see, *e.g.*, *id*. at 2 n.2 (describing the Commission's current interpretation as "a reversal of long-standing Illinois law")). Yet, at the end of the day, Plaintiffs correctly point out that the alternative interpretation offered by *amici* – and, indeed, any interpretation other than the Commission's – is "irrelevant." Pl. Resp. to *Amici* at 6; see also *id*. at 7 ("The interpretation and enforcement regime that matters to Plaintiffs' Commerce Clause claim is that which the ILCC has adopted"). In the words of the Seventh Circuit, to the extent that Plaintiffs, *amici*, or anyone else desires to challenge the correctness – as opposed to the constitutionality – of Defendants' construction of the Act, they are "free to take [their] contentions to state court." *Burgess*, 996 F.2d at 184.

B.      **Discrimination Under The Commerce Clause**

To avoid "economic balkanization" and "a proliferation of trade zones" among the states, the Commerce Clause imposes a "dormant" or "negative" constraint on the power of states to enact legislation that interferes with or burdens interstate commerce. *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 98 (1994); *Granholm v. Heald*, 544 U.S. 460, 472-73 (2005). Under this doctrine, "in all but the narrowest circumstances, state laws violate the

Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm*, 544 U.S. at 472; *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995) (explaining that laws that discriminate against interstate commerce are "treated as all but *per se* unconstitutional"). Laws that discriminate explicitly against interstate commerce – that is, laws that by their own terms favor in-state economic interests over out-of-state interests – are *per se* invalid, unless the state demonstrates that the discrimination "advanc[es] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives."[7] *Granholm*, 544 U.S. at 476, 489. Plaintiffs contend that Defendants' construction of the Act discriminates explicitly against out-of-state brewers, noting that the determination of whether a brewer is permitted to perform the wholesale function in Illinois turns on whether the producer brews its beer in-state or out-of-state.

Under Commerce Clause jurisprudence, laws are analyzed under one of two standards, depending on whether the law discriminates against interstate commerce or whether it regulates evenhandedly with only incidental effects on interstate commerce. If the law discriminates against interstate commerce – whether it discriminates explicitly, has a discriminatory purpose, or has substantial discriminatory effects – the law is subject to a rule of virtual *per se* invalidity. *Or. Waste Sys.*, 511 U.S. at 99 ("If a restriction on commerce is discriminatory, it is virtually *per se* invalid"); *Nat'l Paint*, 45 F.3d at 1131 (same); *Cherry Hill Vineyard, LLC v. Baldacci*, 505

---

[7] Laws that discriminate explicitly sometimes are described as discriminatory "on their face." See, *e.g., Baude v. Heath*, 538 F.3d 608, 611 (7th Cir. 2008), cert. denied, 129 S. Ct. 2382 (2009); *Nat'l Paint*, 45 F.3d at 1130. A law also is considered discriminatory if it is neutral on its face (*i.e.,* does not by its terms favor in-state interests over out-of-state interests) but discriminates in purpose or has a substantial discriminatory effect on interstate commerce. *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9-10, 13 (1st Cir. 2010) (reviewing discriminatory purpose and effect of facially neutral law under *per se* standard of invalidity); *Nat'l Paint*, 45 F.3d at 1131. All three varieties of discrimination are analyzed under the *per se* rule of invalidity.

F.3d 28, 33 (1st Cir. 2007) (noting that a state law that discriminates "on its face, in purpose, or in effect" engenders strict scrutiny under the jurisprudence of the dormant commerce clause).  To avoid the "*per se* rule of invalidity," the state must demonstrate that the law "advanc[es] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives."  See, *e.g., Or. Waste Sys*, 511 U.S. at 101.  On the other hand, a law that regulates evenhandedly with only incidental effects on interstate commerce is valid unless the challenger meets the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), pursuant to which a law is invalid only if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."[8]  *Or. Waste Sys.*, 511 U.S. at 99 (quoting *Pike*, 397 U.S. at 142); *Baude*, 538 F.3d at 611.

A law discriminates explicitly against interstate commerce if by its own terms it regulates disparately out-of-state and in-state economic interests and favors the in-state interests. See, *e.g., Granholm*, 544 U.S. at 467 ("The differential treatment between in-state and out-of-state wineries constitutes explicit discrimination against interstate commerce"); *Or. Waste Sys.*, 511 U.S. at 100 (holding that "[i]n making that geographic distinction, the surcharge patently discriminates against interstate commerce" and thus is "facially discriminatory"); *cf. Nat'l Paint*, 45 F.3d at 1131 ("Chicago's law does not fall into this category, however; it bans all spray paint without regard to its source."); *Baude*, 538 F.3d at 611 (finding that law was not explicitly discriminatory because the challenged "rule applies to every winery, no matter where it is

---

[8]   In *Pike*, an Arizona regulation required that all cantaloupes grown in the state and offered for sale be packed in particular shipping containers before transportation. *Pike*, 397 U.S. at 138.  The plaintiff cantaloupe grower sued because it was prevented from using its packing and shipping center in a nearby state to sort, inspect, pack, and ship its cantaloupes prior to sale.  *Id.* at 139-40. Because the law did not treat out-of-state firms any differently from local firms, but had only an incidental effect on interstate commerce, the Court applied a simple balancing test (ultimately holding that the regulation's burden on interstate commerce outweighed its benefits). *Id.* at 144-45.

located.").  In *Granholm*, the Supreme Court held to be explicitly discriminatory (and struck down pursuant to the dormant Commerce Clause) Michigan and New York alcohol beverage laws that favored in-state producers over out-of-state producers.  544 U.S. at 493.  The challenged Michigan law allowed in-state wineries to bypass Michigan's three-tier system and ship wine directly to consumers subject only to a licensing requirement.  *Id.* at 473-74.  Out-of-state wineries were prohibited from doing the same, regardless of whether they were licensed, and thus their wine had to pass through a wholesaler and retailer before reaching a consumer.  *Id.* at 474.  The challenged New York law allowed both in-state and out-of-state wineries to ship wine to New York consumers, but out-of-state wineries were required to open a branch office and maintain a physical presence in the State.  *Id.* at 474.  Unless out-of-state wineries met this residency requirement, their wine had to pass through the wholesaler and retailer levels of New York's three-tier system to reach consumers.  *Id.* at 474.

The Supreme Court held that both state laws were unenforceable violations of the Commerce Clause.  *Granholm*, 544 U.S. at 476.  The *Granholm* Court described as "obvious" the "discriminatory character" of the Michigan system because the "differential treatment requir[ed] all out-of-state wine, but not all in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers."  *Id.* at 473-74.  With respect to the New York law, the Court found it to be "an indirect way of subjecting out-of-state wineries, but not local ones, to the three-tier system" and "grants in-state wineries access to the State's consumers on preferential terms."  *Id.* at 474.  Consequently, New York's in-state presence requirement ran afoul of Commerce Clause jurisprudence that prohibits states from requiring "an out-of-state firm 'to become a resident in order to compete on equal terms.'"  *Id.* at 475 (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963)).  For those reasons, the Court stated

that it had "no difficulty concluding" that New York's and Michigan's laws discriminated against interstate commerce and thus were subject to the "virtually *per* se rule of invalidity." *Granholm*, 544 U.S. at 476 (quoting *Philadelphia v. New Jersey*, 437 U.S. 617 (1978)).

The *Granholm* Court rejected the contention that the Twenty-first Amendment[9] saves laws that discriminate against out-of-state alcohol producers or products from the traditional *per se* invalidity standard. Although a state's three-tier system for controlling alcohol beverage distribution is "unquestionably legitimate" under the Twenty-first Amendment, *Granholm*, 544 U.S. at 488-89, the "regulation of alcohol is limited by the nondiscrimination principle of the Commerce Clause." *Id.* at 487 (citing *Bacchus,* 468 U.S. 276; *Brown-Forman Distillers*, 476 U.S. 573; *Healy*, 491 U.S. 324); see also *Granholm*, 544 U.S. at 484-85 ("The [Twenty-first] Amendment did not give states the authority to pass non-uniform laws in order to discriminate against out-of state goods."). In other words, the Twenty-first Amendment does not permit states to enact laws that discriminate against out-of-state liquor producers or their goods. *Id.* at 473-76, 489 ("State policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent."). The Michigan and New York laws were invalid under a traditional Commerce Clause analysis because they "involve[d] straightforward attempts to discriminate in favor of local producers." *Granholm*, 544 U.S. at 489.

The Court then considered whether either of the challenged state regimes was saved because it advanced a legitimate local purpose that could not be adequately served by reasonable nondiscriminatory alternatives. *Granholm*, 544 U.S. at 489. Characterizing that test as one that places on the state the burden of demonstrating that the discrimination is "demonstrably

---

9   Section 2 of the Twenty-first Amendment provides:  "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors in violation of the laws thereof, is hereby prohibited."

justified" because "concrete record evidence" showed that nondiscriminatory alternatives "will prove unworkable," the Court determined that neither Michigan nor New York had satisfied this "exacting standard." *Id.* at 492-93 (citations and quotations omitted). The Court concluded with the observation that although the states have broad power to regulate liquor under Section 2 of the Twenty-first Amendment, "[t]his power * * * does not allow States to ban, or severely limit, the direct shipment of out-of-state wine while simultaneously authorizing direct shipment by in-state producers." *Id.* at 493. "Without demonstrating the need for discrimination, New York and Michigan [had] enacted regulations that disadvantage[d] out-of-state wine producers." *Id.* On that basis, the Court held that under Commerce Clause jurisprudence, the challenged state laws could not stand. *Id.*; see also *Action Wholesale Liquors v. Oklahoma Alcoholic Beverage Laws Enforcement Com'n*, 463 F. Supp. 2d 1294, 1300-01 (W.D. Okla. 2006).

A number of courts have applied *Granholm* to hold that state alcoholic beverage laws that discriminate against out-of-state producers are unconstitutional.[10] For example, *Costco Wholesale Corp. v. Hoen,* 407 F. Supp. 2d 1247 (W.D. Wash. 2005), involved Washington statutes that permitted domestic breweries and wineries to be licensed as distributors under the state's three-tier system, but did not permit out-of-state brewers and wineries to perform the wholesale function, and mandated that out-of-state brewers and wineries sell their product to a distributor, which in turn sold the product to a retailer. *Id.* at 1249. The Court held that the

---

[10] See, *e.g., Jelovsek v. Bredesen*, 545 F.3d 431 (6th Cir. 2008) (holding that certain preferences for in-state wineries violated the Commerce Clause, including a residency requirement and a provision allowing wineries to serve free wine samples when a winery used at least 75 percent in-state agricultural products), cert. denied, 130 S. Ct. 199 (2009); *Huber Winery v. Wilcher*, 488 F. Supp. 2d 592, 597 (W.D. Ky. 2006) (holding that Kentucky's farm and small winery direct sale exceptions violated the Commerce Clause because they favored in-state wineries); *Action Wholesale Liquors*, 463 F. Supp. 2d at 1305 (holding that a law violated the Commerce Clause because it allowed instate wineries to ship directly to retailers while prohibiting out-of-state wineries from doing the same); see also *Baude*, 538 F.3d 608 (invalidating an Indiana law that prevented an out-of-state winery from obtaining a permit to ship to Indiana consumers if the out-of-state winery also held a distributor's license in its own state).

discriminatory nature of Washington's system was "obvious," because the privilege of in-state producers to distribute directly to retailers "provides clear advantages to in-state wineries and breweries that out-of-state producers do not enjoy." *Id.* at 1251. Accordingly, the Court held that Washington's system discriminated against out-of-state producers in violation of the Commerce Clause. *Id.* at 1252.

### 1. Application of the *per se invalidity standard in this case*

In the instant case, to distribute beer in Illinois it is necessary to hold a Distributor's License and to import beer from out-of-state as part of this function it is necessary also to hold an Importing Distributor's License. In-state beer producers may hold a Brewer's License, which entitles them to hold Distributor's and Importing Distributor's Licenses. See 235 ILCS 5/5-1(a) ("A Brewer may make sales and deliveries of beer * * * to retailers provided the brewer obtains an importing distributor's license or distributor's license in accordance with the provisions of this Act."). Yet an out-of-state beer producer is ineligible to hold Distributor's and Importing Distributor's Licenses. The bottom line is that in-state brewers are permitted to perform the distribution function in Illinois, while out-of-state brewers are precluded from doing the same. Defendants' construction of Illinois law also does not permit an out-of-state brewer to own or be affiliated with a licensed Illinois Distributor or Importing Distributor. Put differently, the basis for determining whether a brewer can distribute beer in Illinois turns on the brewer's residency; an in-state brewer is eligible, while an out-of-state brewer is not. Thus, by its own terms, this law explicitly discriminates against out-of-state brewers (or, in *Granholm* terms, out-of-state "producers").

Defendants acknowledge that *Granholm* prohibits discrimination against out-of-state liquor producers but attempt to portray this case as one that involves the question of "who can be

a distributor." To that end, Defendants contend that the discrimination at issue affects AB Inc. "only insofar as it wants to act as a *distributor*" and that the discrimination does not affect AB Inc. "in its capacity as producer." Defendants then proceed under a Twenty-first Amendment "core concerns" analysis, which according to Defendants has been applied in three post-*Granholm* cases to conclude that discrimination is constitutional so long as it has some connection to the distributor or retailer tiers of the three-tier system.

The discrimination against out-of-state producers under Defendants' construction of state law cannot be cured through semantics. The cases cited by Defendants do not support Defendants' view that discrimination against out-of-state producers is permissible if the state is determining "who can be a distributor." Rather, those cases hold that only when discrimination against out-of-state producers *is not at issue*, does the Twenty-first Amendment permit states to enact laws that distinguish between retailers and distributors based on the location of their operations. See, *e.g., Siesta Vill. Mkt. LLC v. Steen*, 595 F.3d 249, 258 (5th Cir. 2010) (noting that although *Granholm* prohibits discrimination against out-of-state alcohol products or their producers, "[s]uch discrimination among producers is not the question today"); *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 191 (2d Cir. 2009) ("Because New York's three-tier system * * * does not discriminate against out-of-state products or producers, we need not analyze the regulation further under Commerce Clause principles."); *Brooks v. Vassar*, 462 F.3d 341, 352-54 (4th Cir. 2006) ("[Defendants'] argument must be that in-state retailers are favored over out-of-state retailers * * * * [T]his argument is foreclosed * * * because the dormant Commerce Clause only prevents a State from enacting regulation that favors in-state producers"). The laws at issue in those cases did not involve producers or distributors, but rather involved discrimination against retailers that sought to sell and deliver liquor from outside the state to consumers.

*Arnold's Wines*, 571 F.3d at 190; *Siesta*, 595 F.3d at 256, 260; *Brooks*, 462 F.3d at 352.  These cases also confirm that a law that "discriminates in favor of in-state producers or products * * * will only be upheld if it reasonably advances state interests that cannot be adequately served by reasonable nondiscriminatory alternatives."  *Arnold's Wines*, 571 F.3d at 189; see also *Siesta Village*, 595 F.3d at 258 ("At least as to *producers*, the [*Granholm*] Court held that the [Twenty-first] amendment does not supersede other provisions of the Constitution") (emphasis added); *Brooks*, 462 F.3d at 354.[11]  Defendants admit that the Liquor Control Act uses the geographic location of brewers (producers) to determine "who can be a distributor."  In other words, in-state beer producers are eligible to enjoy the advantages of distributing beer in Illinois, while out-of-state producers are not.  The upshot of this disparate treatment is that an out-of-state brewer's beer must flow through an unaffiliated distributor to reach retailers and thus cannot access the Illinois market on equal terms with in-state brewers, who may sell their beer directly to retailers.  In short, under the Commission's construction of the Act, Plaintiff AB Inc. "cannot act as a *distributor* in Illinois' three-tier system" (Def. Br. at 16) because it is an out-of-state *producer*.

Defendants also attempt to distinguish *Granholm* on the ground that AB Inc. seeks to act on multiple tiers of the three-tier system, rather than bypass the three-tier system entirely.  Yet as Justice Thomas pointed out in his dissent in *Granholm,* describing a producer as "bypassing the three-tier system" is just another way of saying that the producer is acting as its own wholesaler and retailer.  *Granholm*, 544 U.S. at 524 (Thomas, J., dissenting).  Either formulation has the same result:  an out-of-state producer's product must flow through an unaffiliated distributor to

---

[11]  The *Brooks* case originally involved Virginia laws that permitted in-state wineries and breweries to deliver wine and beer to retailers (described as an in-state "distribution privilege") but prohibited out-of-state wineries and breweries from doing the same.  462 F.3d at 346.  The Fourth Circuit did not need to rule on the constitutionality of the in-state "distribution privilege," however, because *Granholm* was decided in the middle of the case, after which "Virginia conceded that [the in-state "distribution privilege" was] unconstitutional under *Granholm*."  *Id.* at 347.

reach retailers and thus cannot access the Illinois market on equal terms with instate producers who may sell their product directly to retailers. See *Costco,* 407 F. Supp. 2d at 1251-52 (in holding that a provision of Washington law that permitted domestic breweries and wineries to be licensed as distributors under the state's three-tier system was unconstitutional under *Granholm*, the court recognized that laws like the one at issue here involve unconstitutional discrimination against producers); *Brooks*, 462 F.3d at 346-47 (conceding that the laws that permitted wine and beer producers to enjoy a "distribution privilege" were unconstitutional under *Granholm*).

Defendants also assert that the *per se* invalidity standard is inapplicable because Plaintiffs do not establish that the law at issue here has a discriminatory purpose or effect. With respect to discriminatory effect, Defendants concede that the acquisition of the remainder of the CITY Beverage business would permit AB Inc. to realize the same common advantages that in-state brewers may achieve by distributing beer. Yet Defendants argue that Plaintiffs must demonstrate that they are "effectively blocked" from the market or are "struggling to survive." The Court must reject that argument, because there is no *de minimis* exception for a law that explicitly discriminates against interstate commerce. *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 650 (1994) (noting that "actual discrimination, wherever it is found, is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred"); *New Energy Co. v. Limbach*, 486 U.S. 269, 276 (1988) ("[W]here discrimination is patent * * * neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown"); *Jelovsek v. Bredesen*, 545 F.3d 431, 437 (6th Cir. 2008) ("[T]here is no *de minimis* exception when evaluating whether a law is discriminatory on its face."), cert. denied, 130 S.Ct. 199 (2009).

The absence of a *de minimis* exception for explicitly discriminatory laws also dooms Defendants' argument that there is no significant discriminatory impact here because "only two small in-state brewers actually act as distributors." The degree to which the discriminatory provision is currently utilized by in-state brewers (*i.e.,* "only two small in-state brewers" actually act as distributors) is irrelevant to the constitutional analysis; under Supreme Court precedent a law that mandates discriminatory treatment by its own terms is invalid even if there are *no* in-state businesses that currently benefit from the discrimination. See *Healy v. Beer Inst.*, 491 U.S. 324, 326 n.2, 340-41 (1989) (holding that, despite the fact that Connecticut had no brewers of its own or local businesses that actually benefited from the law, the statute violated the Commerce Clause because "[o]n its face, the statute discriminate[d] against brewers and shippers of beer engaged in interstate commerce.").

The result of this discrimination against out-of-state brewers is to restrict the ability of out-of-state beer producers to market and sell their beer on equal terms with in-state beer producers. Under *Granholm*, a state may not permit an in-state producer to operate at more than one tier of the state's alcohol beverage licensing system or to bypass one or more of those tiers, without according the same right to out-of-state entities. *Granholm*, 544 U.S. at 473-76. As construed by Defendants, the Liquor Control Act does not evenhandedly regulate the economic interests of in-state and out-of-state beer producers. This "differential treatment" of in-state and out-of-state brewers is *per se* invalid unless the state meets its burden of "advanc[ing] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Granholm*, 544 U.S. at 476, 489.

Given that the Liquor Control Act discriminates by its own terms, the second step of the Commerce Clause analysis requires the Court to determine whether the law meets the very narrow exception to the "virtual[] *per se* rule of invalidity" by "advanc[ing] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Granholm*, 544 U.S. at 476, 489; *Or. Waste Sys.*, 511 U.S. at 101; *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988). "The burden is on the State to show that the *discrimination is demonstrably justified * * *.*" *Granholm*, 544 U.S. at 492 (emphasis in original); *Or. Waste Sys.*, 511 U.S. at 100-101. Satisfying this standard is no easy feat; the Supreme Court has noted that "[t]he State's burden of justification is so heavy that facial discrimination by itself may be a fatal defect."[12] *Or. Waste Sys.*, 511 U.S. at 101 (citation omitted); *Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844, 847 n.3 (11th Cir. 2008) ("Regulations that facially discriminate or have a discriminatory effect on interstate commerce rarely pass the elevated scrutiny test.").

To meet this standard, the State must come forward with concrete record evidence, rather than mere speculation. See *Granholm*, 544 U.S. at 492-93. The Court in *Granholm* rejected the proffered justifications of keeping alcohol out of the hands of minors, facilitating tax collection, facilitating orderly market conditions, protecting public health and safety, and ensuring

---

[12]   The parties have cited only one case in which a state has satisfied its burden under the *per se* standard. See *Maine v. Taylor*, 477 U.S. 131 (1986); *cf. Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 582 n.16 (1997) (noting that the dissent points to a single case in which the Court found that the State actually met the *per se* standard). In *Taylor*, Maine banned shipments into the state of certain types of baitfish that might contain parasites potentially harmful to in-state baitfish and that might inadvertently contain non-native species that could negatively affect Maine's aquatic ecology. *Taylor*, 477 U.S. at 142. The Court held that the statute explicitly discriminated against out-of-state interests, but that protection of the State's aquatic environment was a legitimate local purpose and that no non-discriminatory alternatives existed because, based on evidence the State presented, a ban was the only means of preventing the introduction of parasites and threatening species into Maine's waters. *Id.* at 140-41.

regulatory accountability. *Id.* at 489-93. The Court held that the states presented insufficient evidence to establish that these concerns were tangible, and further recognized that the states' aims could be achieved through non-discriminatory means. *Id.* at 491-92 ("These objectives can * * * be achieved through the alternative of an even-handed licensing requirement"); see also *Costco*, 407 F. Supp. 2d at 1252-54 (rejecting similar rationales to those proffered in *Granholm*); *Glazer's Wholesale Drug Co.. v. Kansas*, 145 F. Supp. 2d 1234 (D. Kan. 2001) (rejecting "minimiz[ing] the infiltration of criminal elements in the [state] liquor industry" as a justification).

Defendants primarily defend their position by arguing that the *per se* invalidity standard does not apply here, rather than addressing their burden of demonstrating that the discrimination advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. See June 16 Trans. at 40 (counsel for Defendants acknowledging that if the Court finds *per se* discrimination, "we fall right to the remedy"). However, in the context of explaining why they contend that Plaintiffs' position in this case amounts to an attack on the three-tier system, Defendants discuss reasons why allowing AB Inc. to act as a distributor would undermine the three-tier system. Essentially, Defendants contend that AB Inc.'s exclusion from the distributor tier is justified (i) by the relative size of the current in-state brewers compared with AB Inc. and (ii) by "the importance of local regulatory control and risk of tax evasion."

Two initial points: First, the arguments that Defendants present are similar, if not identical, to those that have been presented and rejected in other alcohol beverage discrimination cases. See, *e.g., Granholm*, 544 U.S. at 490-93; *Beskind v. Easley*, 325 F.3d 506, 516-18 (4th Cir. 2003); *Action Wholesale Liquors*, 463 F. Supp. 2d at 1303; *Costco*, 407 F. Supp. 2d at 1255.

Defendants have not attempted to distinguish this case from the other cases in which courts have held that the state failed to meet its burden. Second, Defendants' reliance on the affidavit of Pamela Erickson to support portions of their arguments is problematic. The thrust of Ms. Erickson's affidavit is that permitting *any* brewer to distribute beer, especially *any* large brewer, undermines the three-tier system. Consequently, Ms. Erickson's opinions do not explain the need for Illinois to bar only *out-of-state* brewers from distributing beer, which constitutes the discrimination actually at issue in this case.

Turning to Defendants' specific arguments, Defendants contend that the in-state brewers that currently distribute beer "are so small, and produce such a limited volume of beer [that] permitting them to self-distribute does not jeopardize the Act's goal of promoting temperance and competition," while AB Inc.'s "size and significant market presence * * * would be a fundamental alteration to the three-tier system." This argument fails to address the fact that the Liquor Control Act permits *all* in-state brewers to hold Distributor's and Importing Distributor's Licenses, not just small in-state brewers, and prohibits *all* out-of-state brewers from holding Distributor's and Importing Distributor's Licenses, not just large ones. Nor does the argument support the proposition that allowing all in-state brewers to distribute beer while barring all out-of-state producers from doing the same furthers the State's purported goals of temperance and competition. And even if the need to promote temperance and competition were advanced by barring all out-of-state brewers from distributing beer, the argument would fail because Defendants do not attempt to prove that non-discriminatory means would be unworkable to accomplish the State's objectives. Defendants do not address the non-discriminatory alternatives or establish that they would not be effective. *Cf. 44 Liquormart, Inc. v. R.I.*, 517 U.S. 484, 507

(1996) (explaining that higher prices to promote the goal of temperance can be "maintained by direct regulation or taxation" and that educational campaigns also might prove effective).[13]

Defendants next argue that "it is more difficult for state regulatory agencies with limited budgets and resources to exert control over out-of-state licensees" and that "there is an increased risk of tax evasion when a producer and distributor affiliate." As an initial matter, this argument does not justify the discrimination against out-of-state producers because Defendants admit that the purported tax collection problem would apply to *all* producers that act as distributors, regardless of where they are located. Instead, Defendants contend that the purported tax collection problem would be compounded by the fact that AB Inc. is an out-of-state producer.[14] As with Defendants first argument, Defendants fails to cite record evidence for this proposition. See, *e.g.*, *Granholm*, 544 U.S. at 490-93 ("[T]he States provide little concrete evidence * * * * Our Commerce Clause cases demand more than mere speculation to support discrimination against out-of-state goods."); *Chemical Waste*, 504 U.S. at 343 ("[O]nly rhetoric, and not explanation, emerges as to why Alabama targets *only* interstate hazardous waste to meet these goals.") (emphasis in original). Moreover, this tax collection justification fails for the same reason that it failed in *Granholm* and various other cases – Defendants do not establish that this regulatory objective cannot be achieved through reasonable non-discriminatory means. See

_____

[13]  Defendants also do not raise their goals of "temperance" and "competition" above the speculative level, such as, for example, addressing the price at which liquor sales would lead to greater alcohol consumption or why AB Inc.'s presence in the distributor market would result in reduced competition.

[14]  Defendants also admit that post-acquisition CITY Beverage would remain subject to local regulatory control as an in-state operation and thus Illinois' regulatory control over CITY Beverage would not change. In any case, *Granholm* found it to be of particular importance that the Twenty-first Amendment Enforcement Act gives state attorneys general the power to sue alcohol producers in federal court to enjoin violations of state law. *Granholm*, 544 U.S. at 492; 27 U.S.C. § 122a(b). Defendants do not address this statute or explain why it would be ineffective to exert regulatory control over entities that are not local.

*Granholm*, 544 U.S. at 491-93 (holding that the tax collection objectives could "be achieved without discriminating against interstate commerce" because states did not establish that alternative means would be "unworkable"); see also *Costco*, 407 F. Supp. 2d at 1254 (holding that Defendants' argument on tax collection was "speculative and conclusory at best"); *cf.* *Baude*, 538 F.3d at 612 (rejecting tax collection justification even under lower *Pike* standard and stating that "[a]ll the [defendants] can muster in support of the statute is that the three-tier system may help a state collect taxes and monitor the distribution of alcoholic beverages").

In sum, Defendants have not articulated a legitimate local purpose that justifies their discrimination. Although Defendants have come forward with acceptable reasons why alcohol regulations in general and the three-tier system are valid (protecting the three tier system; aiding tax collection; maintaining an orderly market; protecting the public against unsafe alcoholic liquor; promoting temperance; and protecting against vertical monopolies and the introduction of cheap liquor into the marketplace), none of those reasons justifies the discrimination – namely, allowing in-state brewers to act as distributors but prohibiting out-of-state brewers from doing the same – that follows from Defendants' construction of the Act. As the Supreme Court has made clear, "[t]he burden is on the State to show that the *discrimination* is demonstrably justified" (*Granholm*, 544 U.S. at 492 (emphasis in original)), and that burden has not been met here.

### C.    Remedy

*Granholm* mandates that the states treat in-state and out-of-state brewers in an evenhanded manner. Concluding that Defendants' construction of the challenged Illinois laws fails to do so, the Court must fashion the most appropriate remedy. In *Heckler v. Mathews,* 465 U.S. 728, 738 (1984), the Supreme Court stated that when a district court is faced with a

"constitutionally underinclusive" statute, it has "two remedial alternatives: [it] may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion." Applying that guidance to this case, the constitutional infirmities of Illinois' system may be remedied by two possible approaches: (1) allowing out-of-state brewers to distribute directly to retailers; or (2) prohibiting in-state brewers from distributing directly to retailers. In addition, whichever course a court adopts, the court may stay its ruling at least long enough to permit the state legislature to adopt amendatory legislation if it chooses to do so. See *Costco*, 407 F. Supp. 2d at 1256. As the parties have acknowledged, fashioning the appropriate remedy in this case lies within a court's "zone of discretion" (June 16 Trans. at 48; see also Pl. Reply Br. at 14-15) – a position that is confirmed in the pertinent case law. See, *e.g.*, *Cherry Hill Vineyards, LLC v. Lilly*, 553 F.3d 423, 434-35 (6th Cir. 2008) (reviewing district court's remedy for abuse of discretion); see also *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion."). Here, Plaintiffs request that the Court extend the in-state benefit to all brewers; Defendants advocate for the alternative of nullifying the in-state benefit and also ask the Court to temporarily stay its decision to allow the General Assembly time to act if it is so inclined.

In elaborating on the "extension" versus "nullification" dichotomy, the Supreme Court in *Heckler* stated as follows:

> Although the choice between "extension" and "nullification" is within the "constitutional competence of a federal district court," and ordinarily "extension, rather than nullification, is the proper course," the court should not, of course, "use its remedial powers to circumvent the intent of the legislature," and should therefore "measure the intensity of commitment to the residual policy and

consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation."

*Id.* at 739 n. 5 (internal citations omitted). Both sides focus the Court's attention on *Heckler*, but for different reasons. Plaintiffs highlight the language from *Heckler* stating that "extension, rather than nullification" ordinarily is the proper way to remedy an underinclusive statute. In turn, Defendants stress *Heckler*'s admonition that courts should not use their remedial powers "to circumvent the intent of the legislature."

Plaintiffs insist that the Illinois General Assembly already has voiced a clear preference for extension of the in-state benefit to out-of-state interests by amending Section 5/6-29 to conform to the *Granholm* decision.[15] The Court is not persuaded by that argument. The specific problem involving discrimination against out-of-state wineries was obvious in the wake of *Granholm*, and there is no evidence that the General Assembly even considered any existing or potential issues concerning brewers at that time. In enacting economic legislation, the General Assembly may consider one issue at a time, and there is no basis for concluding that it was doing more than that in amending Section 5/6-29. Moreover, at the time that the amendment was enacted, no in-state brewers had been cleared to self-distribute; the record evidence is that the first such license was issued to Big Muddy in June 2009. The current controversy involving brewers thus appears to be of more recent vintage than the wine-shippers dispute that the Supreme Court resolved in *Granholm*. In short, the Court is not convinced that the amendment to Section 5/6-29 provides a clear basis for inferring how the General Assembly would deal with the public policy issue now before the Court.

---

[15] The Liquor Control Act was amended to "authorize direct shipment of wine by an out-of-state maker of wine on the same basis permitted an in-state maker of wine * * * ." 235 ILCS 5/6-29 (a)(1) (2007) (emphasis added).

Plaintiffs also contend that the history and text of Illinois' licensing system also supports extension of the privilege of distribution to out-of-state brewers. According to Plaintiffs, the Liquor Control Act has expressed a preference for brewers to enjoy the right to distribute beer since 1947, and thus extension would recognize the practice in Illinois that for many years permitted out-of-state beer producers to hold Distributor's and Importing Distributor's Licenses. Defendants acknowledge that the Act did not prohibit out-of-state brewers from holding Distributor's and Importing Distributor's Licenses until 1982. Defendants also admit that each year during the period from 1982 through 2005, the Commission issued to AB Inc. in its own name one or more Distributor's and Importing Distributor's Licenses and that during much of the period from 1982 through 2005, one or more affiliates of AB Inc. also held one or more Distributor's and Importing Distributor's Licenses. Similarly, from 2005 through the present, WEDCO has owned a thirty percent stake in CITY Beverage. And the Declaratory Ruling specifically permits WEDCO to retain its current minority interest in CITY Beverage due to the "history and facts surrounding this case." In view of this history, Plaintiffs posit that the "strict separation" of tiers as to brewers has not necessarily existed in reality, and that in view of the Commission's concessions over the years, continued extension of the in-state benefit is the proper course.

Although counsel for Defendants acknowledged at oral argument that the Commission has made exceptions for AB Inc. in prior years, counsel explained that the Commission now views those concessions as having been a "mistake" and rests its current (and, for this litigation, controlling) construction of the Act on its reading of a 1982 amendment. In fact, Plaintiffs' statutory compilation confirms that the General Assembly has made many changes to Illinois' regulatory scheme over the years. While Plaintiffs rely on the legislative compilation to bolster

their position that the legislative intent indicates a preference that all producers be allowed to act as distributors, the legislative and regulatory history in this area does not necessarily lead to that conclusion. The numerous changes to the Act over the years also can be viewed as a manifestation of the General Assembly's intent to continuously revisit the legislative framework and to exercise close oversight over the production, distribution, and sale of alcohol in Illinois. See 235 ILCS 5/1-2 ("This Act shall be liberally construed, to the end that the health, safety and welfare of the People of the State of Illinois shall be protected and temperance in the consumption of alcoholic liquors shall be fostered and promoted by sound and careful control and regulation of the manufacture, sale and distribution of alcoholic liquors"). Finally, in considering the intent of the legislature, the Court must give due regard to the Commission's current construction of the Act – both because the Commission has been charged under state law with administering the state's liquor laws and because that construction was rendered after considerable study of the issue, with the input of interested parties (including Plaintiffs and at least some of the *amici* in this action). See, *e.g.*, *West Belmont, L.L.C. v. City of Chicago*, 349 Ill. App. 3d 46, 49 (1st Dist. 2004) ("we accord substantial weight and deference to an agency's interpretation because agencies are an informed source for ascertaining the legislature's intent" and while that interpretation is "not binding on the court," it is "considered relevant"); *Erfor Corp. v. State Liquor Control Commission*, 47 Ill. App. 3d 72, 74 (1st Dist. 1977) ("The Illinois Liquor Control Commission's interpretation of the statute it was created to enforce is entitled to great weight"); see also 235 ILCS 5/3-12 (conferring broad powers and duties on the Commission).

After considering the arguments of the parties concerning possible manifestations of "the intent of the legislature" that can be drawn from the Act itself as it has been amended and

interpreted over the years (*Heckler*, 465 U.S. at 739 n.5), the Court is left without any clear direction on how the General Assembly would address the specific matter before the Court. The Court thus turns to "the intensity of commitment to the residual policy" and "the degree of potential disruption of the statutory scheme" (*id*.) in its effort to fashion an appropriate remedy.

A helpful analysis in that regard was provided in *Beskind v. Easley,* 325 F.3d 506 (4th Cir. 2003), a case involving a North Carolina law that allowed in-state wine producers to sell directly to consumers, while requiring out-of-state producers to sell through wholesalers. In *Beskind*, the court of appeals concluded that the district court had abused its discretion by extending a preference for in-state wineries. In explaining its reasoning, the court noted:

> [W]e can accept a presumption that North Carolina would want to uphold and preserve all of its [Alcoholic Beverage Control] laws against constitutional challenges. Accordingly, when presented with the need to strike down one or more of those laws as unconstitutional, we can assume that North Carolina would wish us to take the course that least destroys the regulatory scheme that it has put into place pursuant to its powers under the Twenty-first Amendment. And as a matter of comity and harmony, we are duly bound to give effect to such a policy, disturbing only as much of the State regulatory scheme as is necessary to enforce the U.S. Constitution. When applying this "minimum-damage" approach, we have little difficulty in concluding that it causes less disruption to North Carolina's * * * laws to strike the single provision – added in 1981 and creating the local preference – as unconstitutional and thereby leave in place the three-tiered regulatory scheme that North Carolina has employed since 1937 and has given every indication that it wants to continue to employ.

*Id.* at 519. The court added that "[t]he local preference provision gave [plaintiffs] the opportunity to challenge the discrimination but not the right to dictate the course that cures the constitutional violation." *Id*. at 520; see also *Action Wholesale Liquors*, 463 F. Supp. 2d at 1305-07 (recognizing that regulation of the alcoholic beverage industry is a "quintessentially legislative function" implicating policy judgments that "courts are ill-equipped to make"); *Costco,* 407 F. Supp. 2d at 1256 (W.D. Wash. 2005) (determining that withdrawing self-

distribution privileges from in-state wineries would result in "minimum damage" to Washington's three-tier system).

In the Court's view, *Beskind* is particularly instructive because the "minimum damage" approach adopted in that case appears to be entirely consistent with the Supreme Court's admonition in *Heckler* to consider "the intensity of commitment to the residual policy" and "the degree of potential disruption of the statutory scheme" in fashioning a remedy for a Commerce Clause violation. That approach also stresses the importance of "comity and harmony" in undertaking the delicate task that federal courts from time to time must perform in conforming state law to federal constitutional commands. And in this case, all of those considerations point strongly in the direction of removing the exception for in-state brewers, rather than extending the exception for all brewers.

To begin with, the "commitment" to the "residual policy" of permitting in-state brewers to self-distribute is of short duration (since June 2009) and at this point affects only a small handful of entities (three craft brewers). In making that observation, the Court is cognizant that the craft brewers who presently hold distributor licenses value those licenses and have expressed their wish to retain them. See generally Guild Br. (explaining interests of craft brewers that presently hold distributors' licenses and may wish to do so in the future); *id*. at 3 (requesting leave to file *amicus* brief "so that the interests of the Guild's craft brewer members will be adequately represented in this litigation"). However, when viewed against the long history of the three-tier system in Illinois – whether that system is rigid (as Defendants contend) or more relaxed (as Plaintiffs contend) – the intensity of Illinois' commitment to allowing in-state (but not out-of-state) brewers to distribute (their own) beer cannot fairly be characterized as deep or lasting. Indeed, by its own admission, the Commission's current interpretation of the relevant

provisions of the Act was adopted only recently and corrects an earlier "mistake[n]" construction.

In addition, removing the limited exception would eliminate the differential treatment that the Commission recently has permitted (the Commerce Clause's only concern) while keeping intact most of the current three-tier system. It appears that Defendants' proposed remedy could be achieved simply by striking the italicized language from 235 ILCS 5/5-1: "Class 3. A Brewer may make sales and deliveries of beer to importing distributors, and to non-licensees, *and to retailers provided the brewer obtains an importing distributor's license or distributor's license in accordance with the provisions of the Act.* (emphasis added). By contrast, Plaintiffs' proposed remedy would significantly expand the exception far beyond the three licenses that the Commission has granted in the past fifteen months and the concessions (or "mistakes") that the Commission has made to Anheuser-Busch-affiliated entities since 1982.[16] For, in order to pass muster under the Commerce Clause, the right to self-distribute would need to be extended to *all* brewers, not just the three currently licensed craft brewers and the Anheuser-Busch affiliates who have enjoyed that benefit at various times in the past few decades. Finally, extending the self-distribution privilege to out-of-state producers also would require more significant efforts in regard to the State's licensing, enforcement, and tax collection scheme for beer than withdrawing the privilege from in-state producers.

---

[16] As explained above, although Plaintiffs have "vigorously contest[ed]" the Commission's "highly questionable" interpretation of the Act, their federal dormant Commerce Clause claim accepts – indeed, requires – the Commission's interpretation. That point is pertinent to the Court's consideration of Plaintiffs' contention that they do not seek to modify any provisions of the Liquor Control Act (and consequently that accepting their remedy will not do violence to the statute) because the phrase "other than a manufacturer or non-resident dealer" in the definition of "Distributor" merely clarifies that manufacturers and non-resident dealers should not automatically be deemed Distributors if they engage in some of the same conduct that is used to define a Distributor. That argument assumes that the Commission's interpretation of the Act is not just unconstitutional, but also incorrect as a matter of statutory construction.

For all of these reasons, the Court concludes that the more appropriate remedy *from a judicial perspective* would be to withdraw the self-distribution privilege from in-state brewers, rather than extending the privilege to out-of-state brewers. It should be emphasized that the Court is not empowered to decide which alternative represents better public policy – or, indeed, if either of the limited alternatives available to the Court is better or worse than a wide range of other options that the General Assembly of course is free to consider.

The Court recognizes that withdrawing the self-distribution privilege may impose financial hardships on Illinois brewers. The Court also is cognizant that the remedy selected by the Court will not materially advance Plaintiffs' ultimate goal in this litigation – clearing the path to closing on the City Beverage transaction.[17] But these are the consequences of the remedy that, in the Court's view, best comports with a fair assessment of the relevant criteria for fashioning a remedy under *Heckler* and court of appeals and district court cases that have arisen in similar circumstances.

Finally, Defendants contend that the Court should stay the enforcement of its order at least temporarily to provide an opportunity for the General Assembly to act on this matter if it so desires. The Court agrees. To begin with, the regulation of the distribution of liquor is a matter of public policy and a quintessential legislative function. State regulation of the alcoholic beverage industry involves legislative judgments with respect to temperance, public safety, taxation, licensing, and consumer protection, which courts are not as well equipped to make. In

---

[17] As Defendants and *amici* have noted, instead of bringing this action in federal court, Plaintiffs might have chosen to pursue relief in state court, where Plaintiffs could have challenged not only the constitutionality of the Commission's construction of the Act, but also its correctness as a matter of state law. The Court will not speculate as to (i) whether Plaintiffs still may pursue a state court action, (ii) whether Plaintiffs have the better of the argument on the merits, or (iii) whether a ruling in Plaintiffs' favor may have allowed (or still conceivably could allow) their proposed transaction to proceed without any debate about the appropriate remedy.

addition, legislative consideration of a remedy in this case need not be confined to the binary choice that this Court is called upon to make if it selects a remedy. As noted above, the legislative process offers more flexibility for solving the constitutional deficiency than is available judicially. For example, the legislative process could address the constitutional deficiency while simultaneously enacting other measures (not preferences) that would protect Illinois' small brewers. See *Action Wholesale Liquors*, 463 F. Supp. 2d at 1305-07.[18] That flexibility, and the fact that these issues present policy questions rather than legal questions, suggests that a legislative solution, if one is forthcoming, may be preferable to a judicially-crafted one. See *Action Wholesale Liquors*, 463 F. Supp. 2d at 1307 (granting summary judgment on plaintiffs' Commerce Clause claim, opining that "it would be much less disruptive to Oklahoma's long-standing regulatory scheme to remove the exception to the three-tier system which is now unconstitutionally extended to in-state wineries, than it would be to extend the exception to all wineries," but staying entry of judgment in accordance with those rulings on the ground that "a legislative remedy is devoutly to be desired, if that can be accomplished within a reasonable time"); *Costco,* 407 F. Supp. 2d at 1256 (determining that withdrawing self-distribution privileges from in-state wineries would result in "minimum damage" to Washington's three-tier system but staying the order to give the legislature time to amend the statute).

---

[18]    As long as the state legislation does not impermissibly discriminate against interstate commerce, the power of the state to adopt legislation in the realm of economic regulation is near-plenary. Nothing in *Granholm* removed small wineries from favorable legislative consideration, as long as in-state and out-of-state small wineries receive essentially identical legislative treatment. For example, legislative discrimination on the basis of the *size* of commercial enterprises does not implicate interests that have enjoyed exacting judicial review. See, *e.g., Central State University v. American Ass'n of University Professors,* 526 U.S. 124, 127-28, (1999); *Exxon Corp. v. Eagerton,* 462 U.S. 176, 195 (1983). The parties in fact have recognized some of the myriad options that the General Assembly could consider. See Pl. Reply. at 12 n.12 (noting that higher prices to promote the goal of temperance can be maintained by direct regulation or taxation) (citing *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 507 (1996)); 6/16/10 Tr. at 24 (observing that the General Assembly could consider a "gallonage cap").

For all of these reasons, the Court concludes that a stay of enforcement of its decision selecting one of the two available judicial remedies to enable the General Assembly an opportunity to avail itself of a much broader range of solutions to the unconstitutionality of the current Illinois scheme is warranted.[19]  Accordingly, the Court will stay the enforcement of this ruling on Plaintiffs' Commerce Clause claim until March 31, 2011, to provide the Illinois General Assembly with an opportunity to act on this matter if it so chooses.[20]

## IV.  Conclusion

In light of the Supreme Court's decision in *Granholm,* Illinois may not permit in-state brewers to distribute their products directly to retailers while withholding that privilege from out-of-state brewers.  Without demonstrating the need for such discrimination, Illinois' system prevents out-of-state brewers from competing on equal terms with in-state brewers.  Under the Commerce Clause, Illinois' policy favoring in-state brewers cannot stand.  Therefore, the Court grants Plaintiffs' motion for partial summary judgment [28] on its Commerce Clause claim. However, the Court denies Plaintiffs' request to remedy the unconstitutionality of Illinois'

---

[19] In arriving at this conclusion, the Court recognizes Plaintiffs' concern about avoiding "needless delay because it is of the utmost urgency to Plaintiffs that this case be resolved quickly" given the suspension of "an extremely important business transaction for Plaintiffs."  Pl. Reply at 23.  Neither the Court nor Defendants nor *amici* have questioned the importance to Plaintiffs of the proposed transaction.  However, balanced against that interest are the interests of all brewers, both in-state and out-of-state, and the general public in an orderly, consistent, and constitutional legislative and regulatory scheme at all three tiers of the system for liquor production, distribution, and sale.  Given those competing interests, the Court respectfully concludes that giving the General Assembly an opportunity to implement its vision of public policy for all of the concerned citizens and entities outweighs any need for this Court to give immediate effect to its effort to determine what the General Assembly would prefer from disparate sources and the totality of the circumstances.  This exercise of this Court's discretion in that regard is only a second best outcome – although it will be the disposition of this case should the General Assembly decline to act.

[20] Based on the Court's examination of the General Assembly's web page (www.ilga.gov), it is the Court's understanding that the General Assembly does not convene again in Regular Session until January 2011.  While the General Assembly has a Fall Veto Session that begins in November 2010, it is unclear whether it would (or could) consider the kind of legislation that would be necessary to remedy the constitutional violation at that time.  Should the General Assembly act prior to the deadlines set in this opinion, the parties are directed to advise the Court promptly.

system by extending the self-distribution privilege to out-of-state brewers. That remedy would be more disruptive to the existing statutory and regulatory scheme than the alternative remedy of withdrawing the self-distribution privilege from in-state brewers. Finally, in recognition of the General Assembly's ultimate authority over Illinois public policy, including a remedy for the constitutional defect identified in this legislation, the Court stays the enforcement of its ruling until March 31, 2011, in order to provide the General Assembly with sufficient time to act on this matter. The parties are directed to file a joint status report by March 15, 2011, advising the Court of the status of any legislative efforts to address the constitutional defect identified in this opinion, after which time the Court will determine whether to lift or extend the stay. See *Action Wholesale Liquors*, 463 F. Supp. 2d at 1307-08 (employing similar procedure).

Dated: September 3, 2010

_____
Robert M. Dow, Jr.
United States District Judge